**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

ANDREKA THRASH and MELISSA REED,*
    Plaintiffs,                                *
    v.                                     *Civil Action File No. 4:15-cv-97
                                         *
VERANDA ALF, LLC, D/B/A SUMMER'S  *
LANDING AT GREEN ISLAND,          *
    Defendant.                                *

**COMPLAINT**

COMES NOW the Plaintiffs, ANDREKA THRASH and MELISSA REED, and show this Honorable Court the following:

**JURISDICTION AND VENUE**

1.

Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1337, and 1343 which confers original jurisdiction upon this Court of any civil action to recover damages, or to secure equitable relief under any Act of Congress providing for the protection of civil rights under the Declaratory Judgment Statute (22 U.S.C. §2201); 42 U.S.C. § 1981; Title VII, the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 *et seq.*; the Civil Rights Act of 1991.

2.

All violations of Plaintiffs' rights caused by the unlawful employment practices of the Defendants were committed within the jurisdiction of the United States District Court for the Middle District of Georgia, Columbus Division.

## **PARTIES**

3.

Plaintiff Andreka Thrash (hereinafter referred to as "Thrash" or jointly with Plaintiff Reed as "Plaintiffs") is an African American (black) female and submits herself to the jurisdiction of this Court by the filing of this action.

4.

Plaintiff Melissa Reed (hereinafter referred to as "Reed" or jointly with Plaintiff Thrash as "Plaintiffs") is a Caucasian (white) female and submits herself to the jurisdiction of this Court by the filing of this action.

5.

Defendant Veranda ALF, LLC, d/b/a Summer's Landing at Green Island (hereinafter referred to as "Defendant") is a Georgia corporation registered to do business in Georgia and, at all times pertinent hereto, was and is transacting business in Columbus, Muscogee County, Georgia, at its assisted living facility located at 6830 River Road, Columbus, Muscogee County, Georgia. Defendant is subject to the jurisdiction and venue of this Court.

6.

Defendant is an employer engaged in industry affecting commerce within the meaning of Section 701(b), (g), and (h) of Title VII, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981, employing more than fifteen (15) persons for each working day in each of twenty (20) calendar weeks in the current or preceding calendar year.

## **NATURE OF THIS ACTION**

7.

This is a proceeding for declaratory judgment as to Plaintiffs' rights, for a permanent injunction restraining Defendant from maintaining its pattern and practice of race discrimination and retaliation against Plaintiffs and other employees who are similarly situated who are black, who have opposed Defendant's pattern and practice of racial discrimination and retaliation in the workplace, and/or who have participated in Defendant's investigation involving racial harassment and racial discrimination allegations, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981 (hereinafter referred to as § 1981); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended in 1972 and 1991 (hereinafter "Title VII"); the Civil Rights Act of 1991; and 28 U.S.C. §1658.

8.

This action also seeks restitution to Plaintiffs and all other similarly situated current and former employees of all of their rights, privileges, benefits, and income that they would have received but for Defendant's acts that were unlawful and discriminatory in nature, as well as reinstatement in their employment with Defendant or front pay in lieu of reinstatement.

9.

This action further seeks compensatory and punitive damages against Defendant pursuant to 42 U.S.C. §1981, Title VII of the Civil Rights Act of 1964, as amended 1972 and 1991, the Civil Rights Act of 1991.

## ADMINISTRATIVE PROCEDURE AS TO TITLE VII CLAIMS

10.

On or about March 26, 2013, Thrash timely filed a Charge of Discrimination against Defendant based on unlawful racial discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the occurrence of the acts of which Thrash complains and encompassing all of the discriminatory and retaliatory conduct that is the subject of this Complaint.  On or about April 5, 2015, Thrash received her Notice of Right to Sue from the Atlanta District Office of EEOC, and this civil action is instituted in the appropriate federal district court within ninety (90) days of her receipt of said Notice.  Thrash has exhausted all of her administrative remedies and complied with, satisfied, and completely met all prerequisites necessary to filing suit regarding all of her claims herein, specifically including but not limited to her Title VII claims.

11.

On or about March 26, 2013,  Reed timely filed a Charge of Discrimination against Defendant based on unlawful retaliation with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the occurrence of the acts of which Reed complains and encompassing all of the retaliatory conduct that is the subject of this Complaint.  On or about April 5, 2015, Reed received her Notice of Right to Sue from the Atlanta District Office of EEOC, and this civil action is instituted in the appropriate federal district court within ninety (90) days of her receipt of said Notice.  Reed has exhausted all of her administrative remedies and complied with, satisfied, and completely met all prerequisites necessary to filing suit regarding all of her claims herein, specifically including but not limited to her Title VII claims.

# FACTS

12.

When initially hired, Plaintiffs were first supervised by Robbie Monfort, the Executive Director of Defendant's Columbus, Georgia facility. However, at all times pertinent herein, Plaintiffs were supervised by Scarlet Theriot (hereinafter referred to as "Theriot"), a Caucasian (white) female, who succeeded Monfort as the Executive Director of Defendant's Columbus, Georgia facility.

13.

At all pertinent times herein, Plaintiffs were supervised by Bruce Radman (hereinafter referred to as "Radman"), a Caucasian (white) male and the Defendant's Regional Manager who also supervised Monfort and Theriot. At all times pertinent herein, Plaintiffs were told that they were not allowed to talk to Radman or have his contact phone number or email, that only the Executive Director and the secretary Victoria were allowed to have Radman's email and contact phone number. At all pertinent times herein, Plaintiffs were never given any information about how to complain about any unfair or discriminatory treatment to Radman or to any other upper management official and were never given any information about any Human Resources person or department to whom they could bring complaints about unfair or discriminatory treatment.

14.

On or about May 8, 2012, Thrash, a licensed LPN, began working part-time for Defendant as the Director of Resident Care for Defendant's assisted living facility located in Columbus, Muscogee County, Georgia. At a later date, after Theriot had been promoted to Executive Director, Theriot told Thrash that she could go to full-time status as long as she did not work over 40 hours a week. Because of Theriot's assurance that she could work full-time for

Defendant, Thrash gave up her full-time position with her other job, changing it to a PRN position, so she could work for Defendant full-time. After Thrash gave up her full-time position with her other job, Theriot refused to let Thrash work full-time, telling her that she had to work only 32 hours a week or less, telling her that Radman would have a fit if he knew she was there, and telling her to stay home whenever Radman was scheduled to come to the facility.

15.

Thrash's job duties as Director of Resident Care included staff education, ordering and checking in medications, calling the pharmacy as needed, printing assignment sheets for care staff, reviewing MARS for holes, initialing residents' plans of care, and, once Reed was hired, assisting Reed in resolving any new issues. Thrash initially was supervised by Executive Director Robbie Monfort at which time Theriot was the Business Office Manager with no direct supervision over Thrash.

16.

On or around July 30, 2012, Reed began working for Defendant as the Resident Care Coordinator for Defendant's assisted living facility located in Columbus, Muscogee County, Georgia. In contrast to having denied Thrash full-time hours, Theriot gave Reed full-time hours.

17.

Reed's job duties as Resident Care Coordinator included managing medications, managing the medication technicians, managing the daily operations of all the care staff, conducting interviews for new employees, managing activities of daily living for the residents, monthly scheduling for care staff, and managing monthly medication change-over.

18.

Reed and Thrash worked hand in hand as a team, with similar job duties, although Thrash performed job duties that only a licensed person could do since she was a licensed LPN and Reed was not a licensed medical professional.

19.

On or around August 2012, Radman fired Monfort and promoted Theriot from her position of Business Office Manager to the position of Executive Director of Defendant's Columbus, Georgia facility, placing Theriot in a position of direct supervision and authority over Thrash and Reed.

20.

Beginning on or around August 2012/September 2012, Thrash noticed that Theroit changed her behavior towards her, including treating her as if she were invisible, engaging Reed but ignoring her, giving Reed her office, and failing to provide her with her own computer or telephone. Theriot began informing Reed, but not Thrash, about things that were related to Thrash's job, even though Thrash was licensed as an LPN and more responsible for the work than Reed, who was not medically trained or licensed.

21.

During the months of approximately September and October 2012, the facility's census increased, adding more residents to be managed. As a result, Reed asked Thrash to work more with her to help with the increased workload. Reed and Thrash then began working more closely with each other in order to complete their duties and thereby developed a close, efficient, and effective working relationship. Reed and Thrash worked longer hours, coordinated their work with each other, and worked well together which ensured that the residents and care staff had

what they needed. Reed and Thrash rarely even took lunch breaks but worked through them to be able to leave on time at night. At times, when Reed had to leave at the end of the work day, Thrash stayed late to finish up anything that needed to be done.

22.

On or around November 2012/December 2012, Theroit took Thrash's desk and office away from her. Theriot's mistreatment of Thrash adversely affected Thrash's ability to do her job duties. Thrash complained to Theriot about not having a phone or a computer to do her job. Despite Thrash's complaints, Theriot took no action to address Thrash's complaints of mistreatment.

23.

On or around October 2012/November 2012, Reed had also noticed the change in Theriot's treatment of Thrash and other black employees. Reed had witnessed Theriot previously making racially derogative comments in the workplace, including referring to black employees with the "n" word. Reed also noticed how Theriot was mistreating Thrash in the workplace. Because Reed was extremely offended by Theriot's racist comments about black employees and because she believed that Thrash needed to know the truth about Theriot, on or around November/December 2012, Reed forwarded to Thrash a text message from Theriot in which Theriot referred to black employees as "n…..s."

24.

On or about January 4, 2013, Theriot called Reed into her office and grilled her about her close working relationship with Thrash. Theriot told Reed that she didn't like how things had changed and that she disapproved of Reed having such a close working relationship with Thrash. Theirot had previously made comments to Reed about how she (Theriot) had never had any

black friends and that "no matter how a 'n…..' acted in front of white people, a 'n…..' would always be a 'n……'"

25.

On or about January 6, 2013, Victoria, the secretary for the Defendant's Columbus, Georgia facility, quit and gave Thrash the email address for Radman, which she had been forbidden to do when she worked for Defendant. On or about January 6, 2013, with the assistance of Reed, Thrash emailed Radman an official complaint about "EEOC issues" with Theriot, including her complaint about how she had been mistreated by Theriot and about Theriot using a racially derogatory term, i.e. the "n" word, when referring to black staff employees. Thrash attached to her email a copy of Theriot's text message in which she referred to black staff employees as "n…..s." Thrash also attached the letter of resignation she intended to give to Theriot the next day, stating that because of the racially hostile work environment, she was reluctantly resigning, giving Defendant a two-week notice, i.e. that her last day of employment with Defendant would be January 18, 2013.

26.

Radman immediately informed Theriot about Thrash's emailed complaint of race discrimination and forwarded Thrash's complaint, along with its attachments, via email to Theriot.

27.

On or about January 7, 2013, when Thrash reported to work, expecting to work out her two-week notice, Theriot immediately terminated her employment, effective immediately, escorted her from the premises, and banned her from returning to the facility and from having any future contact with any of the facility residents, families, or employees.

28.

Defendant's banning Thrash from any future contact with Defendant's facility residents adversely affected Thrash's job opportunities, including being able to provide PRN nursing care for facility residents through her work with home health agencies, as she had done in the past before she became an employee of Defendant, and including being able to provide any type of health care supervision involving facility residents in the performance of her duties with other healthcare-related employers.

29.

On or about January 7, 2013, Theriot called Reed into her office and said that she needed to talk to her. Theriot was visibly angry and accused Reed and Thrash of going behind her back and undermining her to her boss, trying to make her look like a bad boss. Theriot waved papers in the air saying she had proof that Reed and Thrash had contacted her boss and complained to him about her. Theriot asked Reed if she wanted to be fired or resign. Under threat of termination, and because she needed to protect her work history, Reed felt she had no choice but to submit a resignation letter instead of being fired. Reed stated in her letter that she was giving Defendant a two-week notice so she could help train her replacement. Theriot refused to let Reed work out her notice, accused her of not preforming her job up to standard, and had Reed escorted out of the building that day. Theriot terminated Reed's employment, effective immediately, and banned her from any future contact with any facility residents, families, or employees.

30.

Defendant took no action whatsoever at any time to address Plaintiffs' complaints of race discrimination and retaliation or to address or correct Defendant's unlawful retaliatory

termination of Plaintiffs for opposing Defendant's unlawful employment discrimination and for participating in Defendant's investigation of complaints of unlawful employment discrimination.

## COUNT ONE: VIOLATION OF 42 U.S.C.§2000e, ET SEQ.
## (TITLE VII – RETALIATION – OPPOSITION AND PARTICIPATION)

31.

Plaintiffs reallege and incorporate herein all preceding paragraphs of this Complaint.

32.

The effect of Defendant's above-stated actions of retaliation against Plaintiffs because of their good faith opposition to unlawful race discrimination and retaliation and their good faith participation in an employment discrimination investigation has been to deprive Plaintiffs and other similarly situated employees of equal employment opportunities, income in the form of wages, prospective retirement benefits, social security, and other benefits due them as workers. Plaintiffs and other similarly situated employees have suffered, are now suffering, and will continue to suffer irreparable injury from Defendant's policies and practices as set forth in this Complaint, including but not limited to lost wages, benefits of employment, emotional distress, humiliation, outrage, damage to reputation, the deprivation of rights under state and federal law, and retaliation for exercising the right of access to the Courts.

33.

As a direct and proximate result of Defendant's actions, or inaction, as described herein, Plaintiffs were subjected to unlawful retaliation by Defendant because of their good faith complaints about Defendant's unlawful race discrimination and retaliation and their good faith participation in an employment discrimination investigation, including but not limited to Defendant unlawfully discharging Plaintiffs and banning them from any future contact with facility residents, families, and employees.

34.

In regard to Count One of this Complaint, Defendant has acted intentionally, willfully, maliciously, arbitrarily and capriciously, and in bad faith.

35.

Plaintiffs are entitled to equitable and monetary relief, including compensatory and punitive damages, for Defendant's violations of Title VII of the Civil Rights Act of 1964, as amended.

### COUNT TWO:  VIOLATION OF 42 U.S.C. §1981 – RETALIATION

36.

Plaintiffs reallege and incorporate herein all preceding paragraphs of this Complaint.

37.

The employment relationship between each Plaintiff herein and Defendant is a contract within the meaning of 42 U.S.C. §1981 which gives rise to a cause of action where racial discrimination and/or retaliation is alleged to be the causative agent of adverse employment action.

38.

Defendant's unlawful retaliatory employment practices and actions against Plaintiffs, as described herein, were discriminatorily based on their good faith complaints about unlawful race discrimination and retaliation and their good faith participation in an employment discrimination investigation, and therefore violated their rights under 42 U.S.C. §1981, thus entitling Plaintiffs to all appropriate relief provided under the statute.  Defendant's actions and/or inaction violated 42 U.S.C. §1981, including but not limited to unlawfully discharging Plaintiffs and banning them from any future contact with facility residents, families, and employees.  As the direct and proximate result of Defendant's violation of 42 U.S.C. §1981, Plaintiffs have suffered damages consisting of but not limited to economic loss, emotional distress, humiliation, and damage to reputation.

39.

Plaintiffs are entitled to all damages allowable pursuant to the statute for Defendant's violation of 42 U.S.C. §1981, including injunctive relief, compensatory damages, and punitive damages.

40.

In regard to Count Two of this Complaint, Defendant has acted intentionally, willfully, maliciously, arbitrarily and capriciously, and in bad faith.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court advance this case on the docket, order a speedy hearing at the earliest practicable date, cause this action to be expedited, and upon such hearing to:

1.   Issue a declaratory judgment that Defendant's acts, policies, and procedures violated Plaintiffs' rights as secured under 42 U.S.C. §1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (as amended 1972 and 1991), and the Civil Rights Act of 1991;

2.   Permanently enjoin Defendant, its officers, agents, successors, employees, attorneys, and those acting in concert with them, from engaging in any employment policy or practice which discriminates and retaliates against any employee because they complain about and/or oppose Defendant's unlawful racially discriminatory employment practices and/or because they participate in an employment discrimination investigation;

3.   Grant to Plaintiffs judgment against Defendants pursuant to 42 U.S.C. §1981 and pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (as amended 1972 and 1991), the Civil Rights Act of 1991, for compensatory damages in an amount reasonable and commensurate with the emotional distress caused to Plaintiffs by Defendant's discriminatory acts,

including but not limited to damages for emotional distress, for lost wages and benefits, for reduced earning capacity, as well as reinstatement in their employment with Defendant or front pay in lieu of reinstatement;

4. Grant to Plaintiffs judgment against Defendant pursuant to 42 U.S.C. §1981, to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. (as amended 1972 and 1991) and the Civil Rights Act of 1991, for punitive damages in an amount reasonable and commensurate with the harm done and calculated to be sufficient to deter such conduct in the future;

5. Grant to Plaintiffs a jury trial on all issues so triable;

6. Award Plaintiffs the costs of this action together with reasonable attorney's fees and expenses of litigation as provided by § 706 (k) of Title VII and 42 U.S.C. § 1981; and

7. Grant such additional relief as this Court deems proper and just.

Respectfully submitted, this 28th day of June, 2015.

                                    Respectfully submitted,

                                    s/ *Gwyn P. Newsom*
                                    Law Office of Gwyn P. Newsom, LLC
                                    Georgia Bar No. 541450
                                    Attorney for Plaintiff

P.O. Box 629
Columbus, GA  31902-0629
Ph:  (706) 324-4900
Fax:  (707) 327-1437
gnewsomlaw@aol.com